

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-11-00313-CR

RAPHAEL JOHN DONATO                                APPELLANT

V.

THE STATE OF TEXAS                                      STATE

----------

## FROM THE 396TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### Introduction

Appellant Raphael John Donato appeals his conviction for indecency with a child, contending in five points that the trial court erred by (1) admitting extraneous-offense evidence, (2) allowing the State to intimidate one of its own witnesses, (3) refusing a requested jury instruction, (4) letting the State ask

---

[1]*See* Tex. R. App. P. 47.4.

Appellant on cross-examination his opinion of the complainant's veracity, and (5) denying his request to play a movie. We affirm.

**Background**

Three nights before Christmas in 2009, Appellant's daughter, B, hosted a sleepover for two of her friends, A and C, both fourteen years old. The girls watched *Paranormal Activity*, which they described at trial as a "scary movie," and then sometime around midnight, they climbed the stairs to B's bedroom, where they watched television and chatted for another hour or so before falling asleep in the same bed. A slept next to the wall, B occupied the middle, and C took the side nearest the bedroom door.

It is undisputed that Appellant entered the girls' bedroom after midnight that night. The dispute, to a minor degree, was over how many times he did and, to a major degree, what he did while he was in there. C testified that he twice molested her. Appellant advanced a number of theories in his defense that he did not: (1) she mistook him for someone else, either (a) his ten-year-old son or (b) an unidentified, most likely intoxicated, late-night caller; (2) her mother put her up to fabricating the allegations in hopes of winning a "multimillion dollar" civil lawsuit she had planned to file against him; (3) C imagined the abuse because the scary movie she had watched had given her a bad dream; and (4) Appellant had no opportunity to commit the abuse.

The State called Appellant's stepdaughter from a previous marriage to testify in rebuttal that during the decade she had lived with him—a period that

2

ended fifteen years before trial—Appellant had molested her more than a thousand times while others were in the home but he was never prosecuted for it. The trial court allowed this testimony over Appellant's rule 404(b) and 403 objections but, at the State's request, the trial court issued a limiting instruction, restricting the jury's consideration of the stepdaughter's testimony to the issue of whether Appellant had the "opportunity" to molest C.

The jury found Appellant guilty and recommended that he receive a probated sentence and pay a fine. The trial court sentenced Appellant to ten years' confinement, probated for ten years, and fined him $10,000.

## Extraneous Bad Acts

In his first point, Appellant asserts that the trial court abused its discretion by admitting the stepdaughter's testimony over his rule 404(b) and 403 objections. The State counters that the evidence was admissible to rebut Appellant's numerous defensive theories, and that in the alternative, Appellant suffered no harm.

### *The Rules*

Evidence of other crimes, wrongs, or acts is not admissible "to prove the character of a person in order to show action in conformity therewith." Tex. R. Evid. 404(b); *De La Paz v. State*, 279 S.W.3d 336, 342 (Tex. Crim. App. 2009). But it may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Tex. R. Evid. 404(b); *De La Paz*, 279 S.W.3d at 342–43. These

3

exceptions are neither mutually exclusive nor collectively exhaustive. *De La Paz*, 279 S.W.3d at 343; *Pondexter v. State*, 942 S.W.2d 577, 583–84 (Tex. Crim. App. 1996), *cert. denied*, 522 U.S. 825 (1997); *Montgomery v. State*, 810 S.W.2d 372, 387 (Tex. Crim. App. 1991) (op. on reh'g); *Banda v. State*, 768 S.W.2d 294, 296 (Tex. Crim. App.) ("[T]he catalogue of 'other purposes' . . . is not exhaustive. Whether or not it neatly fits one of these categories, an extraneous transaction will be admissible so long as it logically tends to make the existence of some fact of consequence more or less probable."), *cert. denied*, 493 U.S. 923 (1989).

"Rule 404(b) is a rule of inclusion rather than exclusion." *De La Paz*, 279 S.W.3d at 343 (quoting *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000)). The rule excludes only evidence offered (or that will be used) solely for proving bad character and, hence, conduct in conformity with bad character. *De La Paz*, 279 S.W.3d at 343; *see Rankin v. State*, 974 S.W.2d 707, 709 (Tex. Crim. App. 1996) ("[I]f evidence (1) is introduced for a purpose other than character conformity, (2) has relevance to a 'fact of consequence' in the case and (3) remains free of any other constitutional or statutory prohibitions, it is admissible."). The proponent of uncharged misconduct evidence need not "stuff" a given set of facts into one of the laundry-list exceptions set out in rule 404(b), but he must be able to explain to the trial court, and to the opponent, the logical and legal rationales that support its admission on a basis other than to show "bad character" or propensity to commit a crime. *De La Paz*, 279 S.W.3d at 343.

4

Even evidence that is admissible under rule 404(b), however, may still be excluded under rule 403, if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Tex. R. Evid. 403; *Montgomery*, 810 S.W.2d at 387.

### *Standard of Review*

"Whether extraneous offense evidence has relevance apart from character conformity, as required by [r]ule 404(b), is a question for the trial court." *De La Paz*, 279 S.W.3d at 343 (quoting *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003)). So, too, is a ruling on the balance between probative value and the counter factors set out in rule 403, although that balance is always slanted toward admission, not exclusion, of otherwise relevant evidence. *Id.*; *see Conner v. State*, 67 S.W.3d 192, 202 (Tex. Crim. App. 2001) ("Rule 403 requires exclusion of evidence only when there exists a clear disparity between the degree of prejudice of the offered evidence and its probative value."); *Montgomery*, 810 S.W.2d at 388 (noting that rule 403 presumes probative value outweighs prejudicial effect "unless in the posture of the particular case the trial court determines otherwise.").

Thus, a trial court's ruling on the admissibility of extraneous offenses is reviewed for an abuse of discretion. *De La Paz*, 279 S.W.3d at 343; *Prible v. State*, 175 S.W.3d 724, 731 (Tex. Crim. App.), *cert. denied*, 546 U.S. 962 (2005); *Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997). As long as the

5

ruling is within the "zone of reasonable disagreement," there is no abuse of discretion, and the ruling will be upheld. *De La Paz*, 279 S.W.3d at 343–44; *Montgomery*, 810 S.W.2d at 391. A trial court's ruling admitting extraneous-offense evidence is generally within this zone if the evidence shows that (1) an extraneous transaction is relevant to a material, nonpropensity issue, and (2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury. *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011); *De La Paz*, 279 S.W.3d at 344; *see Santellan*, 939 S.W.2d at 169.

### *Contested Issues at Trial*

C testified that she had been asleep on her stomach when she awoke to pressure inside her underwear near her "vagina area." She testified that she saw Appellant at her bedside and asked him what he was doing. On direct examination, she testified that he replied, "I'm tucking you in," to which she responded, "okay, good-bye," and he left. On cross-examination, she admitted that she had told the CPS investigator that Appellant had said, "I was just turning off the TV and wanted to turn off all the lights. Good night."

Regardless of what was said, though, C also testified that when Appellant left she felt "shocked" and "confused" but that, nevertheless, she tried to convince herself that nothing had happened. She told the jury that as she tried to fall back asleep Appellant returned and started "grabbing" and "squeezing" her breast. She also reported that because she was afraid and did not know what to

6

do, she pretended to stay asleep until A (who apparently *was* still asleep) rolled over and hit the wall, startling Appellant and allowing C to shift her position and detach.

C further testified that after Appellant had walked out of the room the second time, she "freaked out." Crying and shaking, but without waking B, she roused A and told her that "something was wrong." She drafted a text message on her cellphone, explaining what Appellant had done to her, and she passed it across the sleeping B to A.

A testified that B "didn't show any signs of waking up" as she and C traded text messages. She related that as they were communicating in this fashion, Appellant walked in and demanded to know why they were still up. A testified that C avoided eye contact with Appellant but that A then "came up with a lie that was, like, oh, well, we're scared from the movie and we, like, woke up because we were scared." Appellant responded, "Oh sh—t," and walked out again.[2]

C and A agreed to leave the house together and C called her mother to fetch them. B testified that she awoke around 4:00 a.m. and saw A comforting C, who was crying. They explained that the movie had scared them. B testified that she switched places with C and fell back asleep. She woke up about an hour later and saw the girls climbing out of bed and packing. They told her they were going home because they got scared.

_____

[2]Appellant admitted uttering the expletive because he had let the girls watch a scary movie that had caused one of them to become upset.

C's mother testified that when she picked up C and A, they were "sniffling" and "had their heads down." She testified that after they had dropped off A, C said that Appellant had "touched" her. C's mother called C's father, and he contacted the police.

*No Opportunity*

Among the numerous theories Appellant presented to counter the State's evidence, he advanced the theory that there had been no opportunity for him to molest C and get away with it "even if" he had been "so inclined." His opening statement included these remarks:

> The evidence is going to indicate to you that there was simply no opportunity, even if [Appellant] was so inclined, to molest a 14-year-old girl, a friend of his daughter, that there was simply no opportunity. He's in a house, in bed with his wife, and that this girl that allegedly is abused by him is literally sleeping next to, within inches of his daughter.

> The evidence is going to further indicate to you that [B] is a very light sleeper and that she often wakes up during the night. This is a matter, the evidence will indicate to you, is well known to [Appellant]. This is his daughter. He's known her since birth.

> In addition to that, another girl, who, by the way, the evidence will indicate and already has indicated has slept over at their house hundreds of times, a girl that looked at [Appellant] as a second father and had never had any kind of incident that made her feel uncomfortable or made her feel creepy in any way, shape, or form was also in the bed.

> It's just not plausible. The evidence is going to indicate to you that it just couldn't have happened as [C] thinks it did.

In his case-in-chief, Appellant presented evidence that he could not have molested C because his daughter is a very light sleeper and his wife, who did not

8

sleep at all that night after the girls had gone to bed, had been with him for all but four to five seconds.

Appellant's wife, M, testified that the morning after the sleepover she had to be up early for an important business meeting at 6:00 a.m. She initially fell asleep "around 10:00" but got no sleep at all between 11:00 p.m. and 2:00 a.m. because "[t]he girls had left all the lights on, and they were all up in the room being very loud." She further testified,

> I was crabby by 2:00 in the morning, and I kicked my husband quite firmly in his shin and said, you're getting up too.
>
> . . . .
>
> . . . So he got up and I followed him after. And we proceeded out through the hallway. And I shut off the hallway light as we walked down. And I noticed that [D]'s room, which is on the left-hand side of the hallway, his light was on and his TV was on. So I went into [D]'s room to shut off his light and TV. He had already been sleeping. And [Appellant] went into the girls' room to shut off the light and the TV. And I was out in the hallway, and then he came out in the hallway, and we went back to bed.

Appellant testified that M woke him up because "she was fed up with the girls because she had been awake for quite some time and she wanted me to -- make them be quiet so she can go to sleep." He also testified that when his wife woke him up,

> the TV was on in [the girls'] room. But we also noticed that the TV was on in [the boy's] room, and so [M] never trusts that I will actually discipline my kids, and it's kind of a weird thing, but she wanted to make sure I did, so she followed me. When we got to the hallway . . . she went into [the boy's] room, shut off the TV. . . .

9

I had to proceed and go into the girls' room because my assignment was to make sure the girls were going to be quiet. The girls were sleeping, so I just -- when you walk in the room, the TV is immediately to the left. I walk in there, hit the button, and walked right back out.[3]

M testified that she could not see into the girls' bedroom and did not even pass by it but that Appellant was in there for no more than "[f]our or five seconds." She also testified that after she and Appellant returned to their bed, he "went back to sleep and started snoring," but that she "was wide awake by that point" and just "stirred and stayed awake and just laid there." She told the jury that she did not sleep between 11:00 p.m. and 6:00 a.m. She further testified that there was never a time when Appellant was away from her other than for the few seconds when she was in the boy's room and he was turning the television off in the girls' room and the couple of minutes when he later went in to deal with the girls' crying.

*The Extraneous-Offense Evidence*

Outside the jury's presence, Appellant's former stepdaughter from another marriage testified that during the ten years or so that she had lived with Appellant, he would wait until everyone in the house had gone to sleep and then would creep into her room and molest her. Sometimes she would wake up undressed despite having gone to bed with her clothes on.

---

[3]Earlier, C had testified that the television had been on when she went to sleep but that is was off when she woke up with Appellant's hand pressing near her private parts. She also testified that after she woke up and told A what had happened, the girls turned the television back on.

10

Appellant objected under rules of evidence 404(b) and 403. The trial court allowed the testimony and issued the following instruction:

> I'm anticipating that as a result of this witness you may hear some testimony about the Defendant having committed, if he did, other bad acts other than the offense alleged against him in this indictment. You cannot consider that testimony for any purpose unless you first find and believe beyond a reasonable doubt that he committed those bad acts, if he did commit them, and even then you may only consider that in determining the opportunity that the Defendant may have had, if any, to commit the offense alleged against -- in the indictment against him.

The State spent precisely fifteen minutes presenting the stepdaughter's testimony. She testified that Appellant abused her four or five times a week for approximately ten years—only at night, after she had gone to sleep, and when her brothers, sister, and mother were also in the house.

On cross-examination, defense counsel asked the stepdaughter to explain how Appellant could get out of the bed that he shared with his wife, who was "[s]ometimes" a light sleeper, walk into her room, and abuse her four to five times a week, for a total of more than 2,000 times, without ever waking anyone else.

*Analysis*

*Rule 404(b)*

Evidence that Appellant engaged in similar misconduct in the past—that he would slip out of a bed occupied by a sleeping wife to molest a stepdaughter while other members of the family were in the house asleep, and that he did so over a period of years—undermines Appellant's defensive theory that he had "no opportunity" to molest C because of the presence of his wife, who was awake

11

virtually all night long, and the presence of his own daughter asleep within inches of the complainant in the same bed denied him any opportunity to do so. Thus, the extraneous-offense evidence had relevance apart from any impermissible tendency to only show character conformity, and we hold that the trial court did not abuse its discretion by admitting it. *See Wheeler v. State*, 67 S.W.3d 879, 887–88 (Tex. Crim. App. 2002) (holding extraneous offense involving another child "with family members in the immediate vicinity" admissible to rebut claim of lack of opportunity and impossibility where defense was that defendant was never alone with child victim); *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001) (holding extraneous sexual offense evidence admissible in sexual abuse case where defense claimed lack of opportunity to commit offense because defendant was never alone with victim and many other children were always present); *Abshire v. State*, 62 S.W.3d 857, 860 (Tex. App.—Texarkana 2001, pet. ref'd) (holding extraneous-offense evidence admissible in child sexual assault case where defense was lack of opportunity, and all of defendant's family members testified that he never had opportunity to commit offense in his home because no room was locked and people were always in position to see what transpired in house).

*Rule 403*

But that does not end our inquiry because Appellant also objected under rule 403. That rule presumes that the probative value of relevant evidence exceeds any danger of unfair prejudice. *Hammer v. State*, 296 S.W.3d 555, 568

12

(Tex. Crim. App. 2009); *McFarland v. State*, 845 S.W.2d 824, 837 (Tex. Crim. App. 1992), *cert. denied*, 508 U.S. 963 (1993), *overruled on other grounds by Bingham v. State*, 915 S.W.2d 9 (Tex. Crim. App. 1994). And the rule envisions exclusion of evidence only when there is a "clear disparity between the degree of prejudice of the offered evidence and its probative value." *Hammer*, 296 S.W.3d at 568; *Conner*, 67 S.W.3d at 202; *Joiner v. State*, 825 S.W.2d 701, 708 (Tex. Crim. App. 1992), *cert. denied*, 509 U.S. 925 (1993).

In *Montgomery*, the court of criminal appeals instructed that "unfair prejudice" under rule 403 exists when

> a jury would be more likely to draw an impermissible character conformity inference than the permissible inference for which the evidence is relevant, or if [the extraneous offense evidence] otherwise distracts the jury from the [the instant offense] and invites them to convict on a moral or emotional basis rather than as a reasoned response to the relevant evidence.

810 S.W.2d at 395.

Because the extraneous-offense evidence admitted in this case logically undermines a defensive theory affirmatively and vigorously advanced by Appellant, we hold that the jury was less likely to have drawn an impermissible character conformity inference from the evidence than it was to weigh the evidence against that presented by the defense. Although the extraneous offense was fairly remote in time from the instant offense, the offenses were similar enough in nature and circumstances that evidence of the prior one would not likely have distracted the jury from the instant offense or otherwise cause it to

decide the case on some irrational basis rather than as a reasoned response to all the evidence presented at trial. *See id.* Although the State had a legitimate need for the evidence to rebut Appellant's evidence, it expended no more than fifteen minutes to develop the testimony.

Having held that the evidence was admissible under rule 404(b), we likewise hold that the trial court's ruling did not offend rule 403 and, therefore, was within the trial court's discretion. *See id.* Accordingly, we overrule Appellant's first point.

## Due Process Claim

In his second point, Appellant contends that he was denied due process because the prosecutor intimidated a witness into testifying for the State. The State responds that Appellant forfeited this claim and that even if he had preserved it, the prosecutor did not intimidate, coerce, or threaten the witness.

When the State offered Appellant's former stepdaughter's testimony that Appellant had serially molested her in the past, Appellant objected that her testimony was "unreliable" because "she ha[d] stated that she['d] been threatened by the district attorney's office . . . with . . . being indicted for perjury if she testifie[d] other than the way [the State] want[ed] her to [testify.]"

To preserve a claim for review, the Texas Rules of Appellate Procedure require that the record show that there was an objection stating "the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific

14

grounds were apparent from the context." Tex. R. App. P. 33.1(a)(1)(A). Further, the point on appeal must comport with the objection made at trial. *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012); *Thomas v. State*, 723 S.W.2d 696, 700 (Tex. Crim. App. 1986). Even claimed constitutional errors at trial can be forfeited if a party fails to properly object. *See Clark*, 365 S.W.3d at 339.

While no "hyper-technical or formalistic use of words or phrases" is required in order for an objection to preserve a claim of error, the objecting party must still "let the trial judge know what he wants, why he thinks he is entitled to it, and . . . do so clearly enough for the judge to understand him at a time when the judge is in the proper position to do something about it." *Id.*; *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009) (quoting *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)). In determining whether a complaint on appeal comports with one made at trial, we look to the context of the objection and the shared understanding of the parties at the time. *Clark*, 365 S.W.3d at 339; *Lankston*, 827 S.W.2d at 911.

The two main purposes of requiring a specific objection are to inform the trial judge of the basis of the objection so that he has an opportunity to rule on it and to allow opposing counsel to remedy the error. *Clark*, 365 S.W.3d at 339; *Zillender v. State*, 557 S.W.2d 515, 517 (Tex. Crim. App. 1977) (op. on reh'g). Usually, for a complaint to be obvious without having been explicitly stated and still satisfy the purposes above, there have been statements or actions on the

15

record that clearly indicate what the judge and opposing counsel understood the argument to be. *Clark*, 365 S.W.3d at 339; *Resendez v. State*, 306 S.W.3d 308, 315–16 (Tex. Crim. App. 2009). In *Lankston*, for example, while the defendant's counsel made only a broad objection to violations of the "hearsay rule," the judge, in response, requested that "all the attorneys . . . stay within the parameters of 38.07[2]." 827 S.W.2d at 909. This indicates that there was a shared understanding of the objection and that the judge had a chance to rule on it. Here, however, there is nothing in the record to indicate that either the judge or prosecutor understood Appellant's objections to be complaints that he was suffering any denial of due process.

In *Clark*, the court of criminal appeals held that "badgering, sidebar, argumentative, invading the province of the jury, and mischaracterization objections are not so clearly connected to constitutional protections that they can be assumed to be due-process objections." 365 S.W.3d at 340. The court observed that "[i]f this were the case, then any objection that is based on a rule intended to ensure a fair trial would preserve a due-process claim for appeal [and] would allow any appellant to bootstrap a constitutional issue from the most innocuous trial objection." *Id.* (internal quotation marks omitted).

With these considerations in mind, we hold that Appellant's objection that the witness's testimony was "unreliable" did not preserve a due-process complaint. *See id.*; *Holland v. State*, 802 S.W.2d 696, 700 (Tex. Crim. App. 1991) (holding that hearsay objection did not preserve error on confrontation or

16

due-process grounds); *Agbogwe v. State*, 414 S.W.3d 820, 830 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (holding that relevance objection did not preserve due-process complaint).

While Appellant invoked neither "due process" nor "prosecutor misconduct" when he objected, if we strip away the assertion that the witness's testimony was unreliable, there remains a suggestion of prosecutorial misconduct in the words "threatened by the district attorney's office." Both sides agree that, under certain circumstances, threats from a judge or a prosecutor that dissuade a witness from testifying or convince them to alter their testimony may infringe upon a defendant's due-process rights. *See Webb v. Texas*, 409 U.S. 95, 98, 93 S. Ct. 351, 353 (1972). But even assuming for the sake of argument that Appellant preserved a claim of prosecutorial misconduct, those circumstances do not exist in this case.

"It is not improper *per se* for . . . a prosecuting attorney to advise prospective witnesses of the penalties for testifying falsely." *United States v. Blackwell*, 694 F.2d 1325, 1334 (D.C. Cir. 1982); *see United States v. Whittington*, 783 F.2d 1210, 1219 (5th Cir.), *cert. denied*, 479 U.S. 882 (1986). There is no bright line separating proper from improper perjury warnings. *Davis v. State*, 831 S.W.2d 426, 438 (Tex. App.—Austin 1992, pet. ref'd). "But warnings concerning the dangers of perjury cannot be emphasized to the point where they threaten and intimidate the witness into refusing to testify." *Blackwell*, 694 F.2d at 1334. If the admonition likely precluded a witness "from making a

free and voluntary choice whether or not to testify," *Webb*, 409 U.S. at 98, 93 S. Ct. at 353, or changed the witness's testimony to coincide with the judge's or prosecutor's view of the facts, then a defendant's right to due process may have been violated. *Davis*, 831 S.W.2d at 438 (citing *State v. Melvin*, 388 S.E.2d 72, 79–80 (N.C. 1990)). On the other hand, a warning to a witness made judiciously under circumstances that reasonably indicate a need for it and which has the effect of merely preventing testimony that otherwise would likely have been perjured does not violate a defendant's right to due process. *Id.*

Appellant claims that his former stepdaughter "attempted to recant her testimony of abuse," but that the prosecutor forced her to testify by threatening to charge her with perjury. The record does indeed show that the stepdaughter did not want to testify. But as the following excerpt reveals, Appellant's contention that the prosecutor forced her to testify "other than the way [the State] wanted her to" by threatening to indict her with perjury is a tortured interpretation of the evidence in the record:

> Q. ([By the prosecutor]) Okay. Did you also ask me some questions about if you don't want to testify about what [Appellant] did to you?
>
> A. Yes.
>
> Q. And I said, if you're on the stand, that the judge would instruct you you will have to answer questions?
>
> A. Uh-huh.
>
> Q. Is that a yes?

18

A. Yes.

Q. Now, during that whole conversation, was [I] and Investigator Wells polite with you?

A. Yes.

Q. Were we professional with you?

A. Yes.

Q. At any point did [I] or my investigator threaten you, intimidate you, or anything like that?

A. No.

Q. Now, you showed up this Monday to be sworn in as a witness, correct?

A. Yes.

Q. And I believe between Monday and when I served you with a subpoena, you basically told -- is it Matt?

A. Uh-huh.

Q. Who is that?

A. That's my step-dad.

Q. That you wanted to retract your statement?

A. Yes.

Q. Okay. If you would, would you please tell Judge Gallagher why you wanted to retract your statement?

A. I wanted to retract my statement because this isn't something that I ever talk about with anybody. It's in my past. I have moved past it. In fact, I don't -- I've asked everybody not to even speak to me about this whole court trial outside of court. I just have never been comfortable with discussing any of these things

19

that have happened, so I didn't feel like it would be easy to talk about in court.

Also, if [Appellant] is found guilty of any of this, then my brother and sister would lose their father for however long. So that's another reason why I didn't want to.

Q. Monday morning after you got sworn in, did you and I go right back there behind the courtroom and have a discussion?

A. Yes.

Q. And you told me personally that you wanted to retract your statement?

A. Yes.

Q. Did I tell you, if you're getting ready to tell me that you lied to the police and CPS, I would rather not speak with you?

A. Yes.

Q. Okay. Because I didn't want you to get in trouble?

A. Uh-huh.

Q. Correct?

A. Yes.

Q. And then I asked you to -- did I ask you to read your statement?

A. Yes.

Q. Did you read your statement?

A. Yes.

Q. Not trying to get personal here. Did you get a little emotional?

A. Yes.

20

Q. Did you start crying?

A. Yes.

Q. And I asked you that day, all I need to know is what you put in your statement, is it the truth or is it a lie, correct?

A. Yes.

Q. And the statement you read about [Appellant's] sexually abusing you, you told me it was true, correct?

A. Yes.

Q. Once again, and I just talked to you outside the courtroom, correct?

A. Yes.

Q. I asked you -- did I tell you I wanted your help?

A. Yes, you did.

Q. At any time have I threatened you?

A. No.

Q. Have I ever coerced you?

A. No.

Q. Have I been professional with you every time I've spoken with you?

A. Yes.

Q. Have I been nice to you?

A. Yes.

Q. Have you felt threatened, intimidated, or coerced by anything I personally have done to you, ma'am?

21

A. No.

Q. And -- and the whole thing about Matt calling the defense attorney, you told me that your family feels kind of pressured for you, correct?

A. Yes.

Q. But you do not?

A. No.

[Prosecutor]: Pass the witness.

THE COURT: Cross-examination.

[Defense Counsel]: Yes.

VOIR DIRE EXAMINATION

BY [Defense Counsel]:

Q. Now . . . you understand what the term "retracting a statement" is, right?

A. Yes.

Q. And the term "retracting a statement" means that you're acknowledging that you said the statement was not true?

A. Yes.

Q. Right?

A. Yes.

Q. And you didn't say at any time that, I don't want to testify and these things -- it's going to be difficult for me to talk about it in court. You specifically said on numerous occasions that you want to retract your statement because the allegations made in it were not true. That's what you said, didn't you?

22

A. I just said I wanted to retract, but that was all I said.

Q. Well, your understanding of retraction?

A. Yes.

Q. Is that you do a retraction when you said something that's not true and you want to correct it before you end up perjuring yourself, right?

A. Yes.

Q. Now, isn't it true that [the prosecutor] and/or his investigator told you that if you retract your statement, okay, and you don't testify in court as to what you told the CPS lady, that you needed to get a lawyer?

A. Yes.

Q. And the reason you needed to get a lawyer was because he told you that you would be indicted for perjury, right?

A. Yes.

Q. Now, that's a threat, isn't it?

A. I didn't really take it as a threat. I felt like he was informing me of my decisions.

Q. Well, if somebody says, if a prosecutor says, if you don't testify to A, B, and C, you're going to be indicted for a felony, you have to agree that that's a threat. It might be a polite threat if it's spoken in polite words, but it's still a threat, isn't it?

A. He didn't say if you don't testify. He said at this moment I can no longer speak with you because now you're incriminating yourself for retracting your statement.

Q. Right. You're incriminating yourself by committing perjury if you retract the statement you made, right?

A. Right. But at that point --

23

Q. That's what he said and that was a threat, wasn't it?

A. I don't feel that it was a threat. I don't.

. . . .

Q. Now, why would you have needed [a] lawyer to defend you if you weren't being threatened with prosecution?

A. I don't -- I don't -- it wasn't that I was being threatened. It was I had decided that it was probably the right thing to do to testify[.]

It is apparent from the record that the prosecutor did not force the witness to testify, dissuade her from testifying, or cause her to change her testimony. To the contrary, we conclude that the prosecutor's questioning amounted to merely "a warning to a witness made judiciously under circumstances that reasonably indicate a need for it and which has the effect of merely preventing testimony that otherwise would likely have been perjured." *See id.* Accordingly, even assuming Appellant had preserved his claim, we would hold there was no prosecutorial misconduct and, consequently, no denial of due process.

Obviously, absent misconduct, the prosecutor's treatment of the witness did not rise to the level of fundamental error. *See Clark*, 365 S.W.3d at 340 (citing *Arizona v. Fulminante*, 499 U.S. 279, 309–10, 111 S. Ct. 1246, 1264–65 (1991) (noting that fundamental error occurs when certain constitutional rights are violated, such as the right to counsel, the right to an impartial judge, the right for there not to be an unlawful exclusion of members of the defendant's own race from the grand jury, the right to self-representation at trial, or the right to a public

24

trial)).  Because Appellant forfeited his claim and because the prosecutor's actions were proper and, therefore, did not rise to the level of fundamental error, we overrule Appellant's second point.

**Antisympathy Instruction**

In his third point, Appellant contends that the trial court abused its discretion by denying his request to include the following instruction in the jury charge:  "Do not let bias, prejudice, or sympathy play any part in your deliberations."  Whether to give admonitory instructions in the jury charge to guard against jury misconduct is largely within the discretion of the trial court. *York v. State*, 566 S.W.2d 936, 938 (Tex. Crim. App. [Panel Op.] 1978).

Appellant cites the code of criminal procedure's prohibition on a judge's discussing the facts or using any argument in the charge calculated to arouse the sympathy or excite the passions of the jury.  Tex. Code Crim. Proc. Ann. art. 36.14 (West 2007); *see McFarland v. State*, 928 S.W.2d 482, 522–23 (Tex. Crim. App. 1996), *cert. denied*, 519 U.S. 1119 (1997), *overruled on other grounds by Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998), *cert. denied*, 526 U.S. 1070 (1999).  But a prohibition against the judge doing something is not the same as a mandate that the judge instruct a jury not to do that same something. In other words, while a trial court may violate article 36.14 by issuing a charge that discusses the facts or uses an argument calculated to arouse the sympathies of the jury or excite its passions, Appellant has directed us to no authority requiring a trial court to instruct the jury in a noncapital case not to have

its sympathies aroused or its passions excited. Moreover, two of our sister courts have held to the contrary that the trial court's refusal to give such a charge is not error. *See Vargas v. State*, 697 S.W.2d 496, 499 (Tex. App.—Corpus Christi 1985, no pet.), *overruled on other grounds by Nugent v. State*, 749 S.W.2d 595 (Tex. App.—Corpus Christi 1988, no pet); *Brown v. State*, No. 07-07-00174-CR, 2009 WL 1491881, at *3 (Tex. App.—Amarillo May 28, 2009, no pet.) (mem. op., not designated for publication). We agree with those courts and overrule Appellant's third point. *See York*, 566 S.W.2d at 938.

**Cross-examination Questions about C's Veracity**

In his fourth point, Appellant faults the trial court for allowing the State to cross-examine him about his opinion on C's truthfulness. The State responds that Appellant forfeited his right to complain about this alleged error because he failed to timely object. We agree.

The record shows that before Appellant objected, the prosecutor asked no less than three times whether Appellant thought C was lying. Rather than objecting, Appellant answered.

> Q. [By the prosecutor] And let me ask you this. I mean, to this day, do you think [C] is a liar or not?
>
> A. In what context?
>
> Q. Do you think that she is lying when she says that you came into the room and put your hand down her pants -- her panties and touched her breast? Is she lying or is she not lying?
>
> A. I didn't do it, so she's lying.

26

Q. So she is lying?

A. She's not correct in what she thinks I did.

Q. Okay. Well, sounds like you're kind of spinning the words around a little bit, so let me ask you. In your opinion, because you were there, right?

A. I was in the house?

Q. Right.

A. Yes.

Finally, Appellant's counsel rose to object when the prosecutor repeated the question this way:

Q. So based on the allegations she has made against you, is she lying or is she telling the truth?

[Defense Counsel]: Your Honor, I'm going to object. That calls for him making a conclusion as to the motive of another person. It's speculative.

THE COURT: Overruled.

Q. ([By the prosecutor]) Is she lying or is she telling the truth?

A. At this point I don't know.

Q. Did it happen or did it not?

A. I don't know if it happened.

Q. You don't know if you went into the room and touched her?

A. I know that I did not go in the room and touch her.

The prosecutor again asked whether Appellant thought C had lied, and again, Appellant answered without objection:

27

Q. Okay. So if she says [Appellant] came into the room and touched me, is she telling the truth or is she lying?

A. She's lying.

Q. This good church-going girl is lying, correct?

A. That is a possibility, correct.

Q. So it's really not about this movie that they watched, correct?

A. I don't know.

Q. You said she's lying, she's making it up?

A. I don't know.

To preserve error under our rules of evidence, an objection must be made "as soon as the ground for objection becomes apparent." *Dinkins v. State*, 894 S.W.2d 330, 355 (Tex. Crim. App.), *cert. denied*, 516 U.S. 832 (1995). "[I]f a question clearly calls for an objectionable response, a defendant should make an objection before the witness responds." *Id.* "If he fails to object until after an objectionable question has been asked and answered, and he can show no legitimate reason to justify the delay, his objection is untimely and error is waived." *Id.*

As stated above, the prosecutor asked Appellant a number of times if he thought C had lied, and Appellant answered a number of times before he finally objected. We glean from the record no reason to justify the delay, and Appellant has not offered any. In fact, to the contrary, Appellant inexplicably states in his brief that the trial court permitted the State to ask whether he thought C was a liar

28

"over timely objection." The record does not support this assertion. The objection, when it finally arrived, was too late to preserve Appellant's complaint. Accordingly, we overrule his fourth point. See Tex. R. App. P. 33.1(a)(1); Tex. R. Evid. 103(a)(1); *Lagrone v. State*, 942 S.W.2d 602, 618 (Tex. Crim. App.), *cert. denied*, 522 U.S. 917 (1997); *Dinkins*, 894 S.W.2d at 335.

**The Movie**

In his fifth and final point, Appellant contends that the trial court erred by not letting the jury watch a movie during trial. Specifically, he complains that the trial court erred by prohibiting a screening of the movie *Paranormal Activity*, which Appellant asserted had caused C to imagine her abuse.

The trial court has broad discretion in determining the admissibility of evidence, and its ruling will be upheld absent a clear abuse of discretion. *Allridge v. State*, 850 S.W.2d 471, 492 (Tex. Crim. App. 1991), *cert. denied*, 510 U.S. 831 (1993); *Levario v. State*, 964 S.W.2d 290, 296 (Tex. App.—El Paso 1997, no pet.). An abuse of discretion occurs "only when the trial judge's ruling was so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003) (quoting *Cantu v. State*, 842 S.W.2d 667, 682 (Tex. Crim. App. 1992), *cert. denied*, 509 U.S. 926 (1993)). So long as the ruling is within this zone of reasonable disagreement, a reviewing court will not intercede. *Montgomery*, 810 S.W.2d at 391; *Levario*, 964 S.W.2d at 297.

29

Although Appellant's counsel admitted during oral argument that he had "never seen" the movie he now complains the trial court erred to exclude, it was made part of the record, and the record shows that the trial court judge watched it; we now have, as well. Having reviewed the movie and the rest of the record, we hold that the trial court's ruling was not an abuse of discretion, and even if we were to assume for the sake of argument to the contrary, we would hold beyond a reasonable doubt that the ruling was harmless.

On direct examination, C testified as follows:

Q. Whenever you went over to [Appellant]'s house that night, what did you do?

A. I watched a --

THE COURT: Sorry about that.

THE WITNESS: Okay. I watched a movie.

Q. ([By the prosecutor]) And who else watched the movie?

A. It was me, [B], and [A].

Q. And where did you watch the movie at?

A. In the living room.

Q. And what movie did you watch?

A. Paranormal Activity.

Q. Can you tell the jury what that movie is about?

A. It's about supernatural things. It's not really that much of a scare.

[Defense Counsel]: Your Honor, I'll object. It's not responsive to the question.

THE COURT:  Sustained.

Q.  ([By the prosecutor])  You say it was a supernatural --

A.  Yes.

Q.  -- movie?

Okay what do you mean by that?

A.  Things would move without touching them, like the door would shut.

Q.  And what type of movie was this?

A.  It was a scary movie.

Q.  Did it scare you?

A.  Not necessarily, no.

Q.  Prior to December 2009, had you seen Paranormal Activity?

A.  Yes.  I'd already seen it once.  I saw it in a theater.

Q.  And do you generally like to watch scary movies?

A.  Uh-huh.  I think they're fun.

Q.  What other scary movies have you seen?

A.  I've seen --

[Defense Counsel]:  Your Honor, I'm going to object to the relevance of that.

THE COURT:  Overruled.  I'll let her answer.

THE WITNESS:  I have seen -- there's this really terrible movie.  I don't suggest you see it.

[Defense Counsel]:  Your Honor, I'll object.  That's not responsive to the question.

31

THE COURT:  Sustained.

Q. ([By the prosecutor])  Just name some of the scary movies that you've seen that you like.

. . . .

A.  Amusement, Nightmare on Elm Street.  Jaws isn't really scary, but Jaws.  There's a lot more, but those are just the ones off the top of my head.

. . . .

Q.  Earlier you talked about how you have watched many scary movies, right?

A.  Yes, ma'am.

Q.  Do you generally have nightmares after you watch a scary movie?

A.  No, ma'am.

As already discussed, one of Appellant's defensive theories was that C had a nightmare induced by having watched the movie and that caused her to imagine that Appellant had groped her.  But the trial court reasonably could have concluded from the evidence that C did not have a nightmare at all and that the movie, therefore, was irrelevant.

First, C testified that she enjoyed watching scary movies, she had seen many of them, and she had seen this particular movie before.  Second, she testified that scary movies generally do not cause her to have nightmares.  Third, although there was evidence that C told investigators that the first time Appellant groped her she thought she may have been dreaming, the record also shows that she was wide awake the second time he came in and fondled her breast.

32

Fourth, the record shows that C and A fabricated a story about having a nightmare only so they could leave B's house without having to tell their friend what her father had done. We hold that it is within the zone of reasonable disagreement for the trial court to have concluded from the evidence that C did not have a nightmare and that playing a movie that was supposed to have caused her to have one was not relevant to any material issue in the case. Given the state of the record and the wide discretion trial courts have on questions of admissibility, we hold that the trial court did not abuse its discretion.

Even if we were to hold the trial court erred, whether we consider harm under the test for constitutional or nonconstitutional error, excluding the movie caused Appellant no harm. He argued that the movie caused C to have a nightmare that then caused her to imagine that he abused her. Supposedly, playing the movie would have supported this argument. As we have stated, we have reviewed the movie; it does not support the argument. But even assuming it did, the movie was sufficiently described to the jury to have made the point. First, C described it as a "scary movie," although "not really that much of a scare," that did "not necessarily" scare her. She said it was "about supernatural things" and that in it "[t]hings would move without touching them, like the door would shut."

Appellant's counsel described the movie during opening statement:

> Now, I anticipate that the evidence will show that that movie is about a young woman [who is living with her boyfriend and] is possessed by a demon . . . that . . . attacks or manifests itself when

33

the couple goes to bed, that when they go to sleep, when they're in their bed . . . the demon does certain things . . . that I guess the demons typically do.

But -- and in the movie that these girls watched that night, in one particularly scary scene the demon grabs the young woman and literally drags her out of bed and down the hallway.

Finally, B testified for the defense that she had seen the movie about ten times and that it is about

a boyfriend and a girlfriend living together, and they are haunted by a demon in their house [that] plays pranks[,] . . . slams doors[,] . . . pulls them out of their bed[,] . . . breaks things, makes stomping noises, leaves footprints and handprints and . . supposedly possesses the woman and the woman kills her boyfriend in the end . . . and she was never seen again.

These descriptions of the movie are spot on and adequate to make the point that the girls watched a scary movie before going to bed. Appellant was not harmed. We overrule his fifth point.

## Conclusion

Having overruled all of Appellant's points, we affirm the trial court's judgment.

/s/ Anne Gardner
ANNE GARDNER
JUSTICE

PANEL: LIVINGSTON, C.J.; DAUPHINOT and GARDNER, JJ.

DAUPHINOT, J., concurs without opinion.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: April 30, 2014

34