In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-00-00013-CR


______________________________




DALE E. ABSHIRE, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 1st Judicial District Court


Newton County, Texas


Trial Court No. 4755




 




Before Cornelius, C.J., Grant and Ross, JJ.


Opinion by Chief Justice Cornelius


 Dissenting Opinion by Justice Grant 

O P I N I O N



 A jury convicted Dale E. Abshire of aggravated sexual assault of a child and set his
punishment at confinement for life. Abshire contends the trial court erred in admitting extraneous
offense evidence.

 Abshire was accused of sexually assaulting his seven-year-old niece, Velta James, on or
about May 10, 1998. Velta testified to several instances of molestation occurring at different times. 
In his defense, Abshire called members of his family to testify. David Abshire, one of Abshire's two
sons, testified that he lived with his father and mother; that other members of his family, including
his grandmother, his brother and his brother's family, and Velta and her family, lived nearby in
separate houses or mobile homes on the same land; that on May 10, he was home all day with his
father, mother, and brother; that he and his father watched television from about 4:00 p.m. until late
into the evening; and that Velta did not come to his parents' house that day. He also testified that
he never witnessed his father and Velta together when his mother was not also there and that he
never saw his father do anything unusual to or with Velta. 

 Dean Abshire, Abshire's other son, testified that he lived with his family in a house a few feet
from Abshire's house; that the family members visited each other frequently and had informal access
to the other homes; that on May 10, he was at his parents' house all day except for brief periods when
he went back to his own home, and a period of forty-five minutes when he went to his wife's family's
house; and that Velta was at his grandmother's house, but also came to his parents' house briefly and
intermittently. 

 Abshire's  wife,  Nonie,  testified  that  she  was  with Abshire practically the entire day on
May 10. She testified that Abshire and she awoke around 9:00 a.m. and ate breakfast around
10:00 a.m.; that she went briefly to her mother's house, which is located on the same property; that
Abshire stayed home most of the day because he was waiting for a telephone call concerning his
older daughter Annette, who was sick with cancer; that Abshire and she also went to the store; and
that they spoke to Velta briefly as they were leaving the house. She testified that Velta did not come
to their house any other time that day. 

 In rebuttal, after the defense rested its case-in-chief, the State called Abshire's thirty-year-old
daughter, Shenona Woods. After a hearing outside the jury's presence, Abshire objected to Woods's
testimony under Tex. R. Evid. 403 and 404(b). The State asserted that her testimony was relevant
to refute evidence that Abshire lacked opportunity to molest Velta, to show his motive or intent, and
to establish his identity as the perpetrator of the sexual assault on Velta. The trial court overruled
Abshire's objection, but gave the jury a limiting instruction.

 Woods testified that she lived with Abshire, Nonie, David, and Dean until she was seventeen
years old; that Abshire molested her repeatedly beginning when she was five years old until she left
home at age seventeen; that Abshire told her it was his responsibility as her father to teach her about
sex; and that he made her swear not to tell anyone. She also testified that she became pregnant by
Abshire and gave birth to a child who later died from a medical condition caused by inbreeding.

 The general rule is that evidence of other crimes, wrongs, or acts is inadmissible to prove a
person's character, but evidence of other crimes, wrongs, or acts is admissible for other purposes. 
Tex. R. Evid. 404. If an objection is made to extraneous offense evidence under Rule 404(b), the
proponent of the evidence must persuade the trial court that the evidence has relevance apart from
character conformity, i.e., that it tends to establish some elemental fact such as identity or intent; that
it tends to establish some evidentiary fact such as motive, opportunity, or preparation leading
inferentially to an elemental fact; or that it rebuts a defensive theory, e.g., the absence of mistake or
accident. Tex. R. Evid. 404(b); Montgomery v. State, 810 S.W.2d 372, 387-88 (Tex. Crim. App.
1990) (op. on reh'g); McAllister v. State, 34 S.W.3d 346, 353 (Tex. App.Texarkana 2000, pet.
ref'd).

 We need not decide whether the extraneous evidence here was adequate to show intent or
motive, because we find that Abshire "opened the door" to such evidence, and the evidence was
admissible to rebut a defensive theory. 

 During the defense's case-in-chief, and before the State offered any extraneous offense
evidence, the defense produced testimony from Abshire's sons, David and Dean, and Abshire's wife,
Nonie, that Dale Abshire was not the kind of person who would sexually abuse a child, and that he
never had an opportunity to do so in his home because no room was ever locked, and friends and
family members freely came in and out of the house or were always in a position to see what
transpired in the house. These witnesses said they were always with or around Abshire, and they
never saw him do anything improper. Dean Abshire testified that his father baby-sits with his child
frequently and that he never knew of anything bad happening to the child while he was in Abshire's
care. Nonie Abshire testified she is always with Abshire when he is not at work; that she and he
have been "together" for thirty-two years; and that she "never saw nothing like that." She also
testified that Velta's own father had been accused of sexually abusing her and that Abshire told her
"he never touched those girls." (Emphasis added.)

 To illustrate the nature of the defense's evidence about Abshire's lack of any sexual contact
with any other children, Abshire's own brief in this appeal characterizes the evidence thusly: "In
summary, the testimony of appellant's family was that they had lived in the same home with
appellant for approximately thirty years and had not witnessed him perform sexual acts on anyone." 
(Emphasis added.)

 Additionally, the defense on rebuttal elicited testimony from two other witnesses who
testified that in addition to Velta, Abshire had also been accused of sexually abusing Nola James,
Christopher James, and Veronica Berza, all when they were minors. More importantly, Abshire
himself on re-direct examination by his own counsel, testified that he had been accused of several
rapes, but denied committing them. He also testified that he had never been put on probation for
"molesting any child." Although this additional testimony was produced by the defense on rebuttal
after the State had introduced its evidence of extraneous acts between Abshire and his daughter,
Shenona, this additional testimony about extraneous acts went far beyond any defensive attack on
the State's evidence and clearly explored multiple allegations of sexual abuse of children by Abshire
over a long period of years.

 When a party produces evidence tending to create a false impression of his law-abiding
behavior, he opens the door on his otherwise irrelevant past criminal history, and opposing counsel
may introduce evidence tending to rebut the false impression. Delk v. State, 855 S.W.2d 700, 704
(Tex. Crim. App. 1993); Prescott v. State, 744 S.W.2d 128, 131 (Tex. Crim. App. 1988); Wells v.
State, 880 S.W.2d 185, 189 (Tex. App.-Texarkana 1994, pet. ref'd); Monkhouse v. State, 861 S.W.2d
473 (Tex. App.-Texarkana 1993, no pet.). This rule is not limited to final convictions. Prescott v.
State, 744 S.W.2d 128; Metts v. State, 22 S.W.3d 544, 549 (Tex. App.-Fort Worth 2000, no pet.);
Royal v. State, 944 S.W.2d 33 (Tex. App.-Texarkana 1997, pet. ref'd). Although the trial court here
admitted the extraneous evidence about the sexual abuse of Shenona for the purpose of showing
intent and identity, we uphold the court's action if it is legally correct, even if the court's reason for
admitting the evidence was erroneous. See Romero v. State, 800 S.W.2d 539, 543 (Tex. Crim. App.
1990); Dugard v. State, 688 S.W.2d 524, 530 n.2 (Tex. Crim. App. 1985).

 The second reason the State's evidence was admissible is because it was relevant to rebut a
defensive theory. Texas law allows evidence of extraneous bad acts by the defendant to be admitted
to rebut a defensive theory. Ransom v. State, 920 S.W.2d 288, 301 (Tex. Crim. App. 1994);
Montgomery v. State, 810 S.W.2d at 388 (Tex. Crim. App. 1990); Roberts v. State, 29 S.W.3d 596,
601 (Tex. App.-Houston [1st Dist.] 2000, pet. ref'd). Abshire's main defense was that Velta had
been sexually abused numerous times but that the abusers were Velta's father, Robert James, and two
other men, Glynn Fountain and a Mr. Bowman, both relatives of Velta. Abshire steadfastly
contended that he was not the kind of person who would do something like sexually abusing a child;
that he never had an opportunity to abuse anyone in his home; and that the other named persons had
also been accused of molesting Velta. The State's rebuttal evidence about the abuse of Shenona
showed that she was assaulted in Abshire's home and that Abshire took her in a room and "locked
the boys out" when the molestation occurred, showing that he did have an opportunity to commit
such acts privately in his home.

 The trial court properly overruled Abshire's Rule 403 objection. The court conducted a
balancing test and stated in the record that he found the extraneous acts evidence more probative than
prejudicial. In light of all the evidence, and considering the nature of Abshire's defense, we find that
the trial court did not abuse its discretion in so concluding.

 Because Abshire clearly opened the door to proof of extraneous offenses, the court did not
err in allowing the extraneous offense evidence. 

 The judgment is affirmed.


 William J. Cornelius

 Chief Justice



DISSENTING OPINION


 Because Abshire did not open the door to Shenona Woods's testimony and because her
testimony was not otherwise admissible to rebut a defensive theory or to prove Abshire's motive or
intent, I respectfully dissent. Woods's testimony involved events that occurred thirteen years prior
to the alleged acts committed in the present case. Unless there were some legal bases for introducing
this testimony, it should have been excluded. Abshire was entitled to a fair trial under the rules of
evidence on the offense for which he was indicted. 

 The majority opinion advances three theories why Woods's testimony was admissible. First,
the majority contends Abshire opened the door to Woods's testimony. Second, the majority contends
the evidence was admissible to rebut a false impression of Abshire's law-abiding behavior. Third,
the majority contends the evidence was admissible to rebut Abshire's defensive theory.

 As to the first theory, the majority contends Abshire opened the door to Woods's testimony
by eliciting testimony from David, Dean, and Nonie Abshire that he "was not the kind of person who
would sexually abuse a child." These witnesses never testified that Abshire was not the kind of
person who would sexually abuse a child; at most, they testified that they had never seen him do
anything inappropriate to the complainant. Dean Abshire also testified that Abshire baby-sat his son
and that nothing out of the ordinary had occurred. At no time did they make a blanket assertion that
Abshire would not sexually abuse a child.

 The majority also asserts that Nonie accused the complainant's father, Robert James, of
sexually abusing the complainant. However, the majority takes her testimony out of context. In fact,
it was the prosecutor who brought out the fact that the complainant had accused her father of
sexually abusing her. The prosecutor asked Nonie, "Do you know what Mr. Robert James has been
accused of?" Nonie responded, "Yes, I do." The prosecutor then stated, "Okay. He's also been
accused of molesting his daughter [the complainant]."

 The majority portrays Nonie's testimony - that Abshire told her, "I never touched those
girls," - as if Abshire was denying that he touched the complainant and Woods. (Emphasis added.) 
In actuality, Nonie testified, in response to questions from the prosecutor, that she asked Abshire
whether he sexually abused the complainant or the complainant's sister, and he responded that he had
not touched either one of those girls. Thus, Nonie's testimony was that Abshire denied sexually
abusing the complainant. She did not testify that he was not the kind of person who would sexually
abuse children.

 The majority also contends Abshire opened the door by eliciting testimony that he never had
an opportunity to sexually abuse a child because no room in his house was ever locked and because
neighbors and relatives were constantly at his house. The majority's contention is based largely on
a mistaken view of the testimony. The majority observes, "These witnesses [i.e., Dean, David, and
Nonie] said they were always with or around Abshire, and they never saw him do anything
improper." 

 While it is true that the testimonies of Abshire's witnesses portray a family living close
together on the same land and having informal access to each other's homes, Abshire's witnesses did
not call into question whether Abshire ever had the opportunity to molest the complainant. David
and Dean never testified they were always around Abshire. Rather, they testified they were with him
on May 10, 1998, the day the alleged offense occurred. In fact, David testified that he works from
5:00 a.m. to 3:30 p.m., but that Abshire leaves for work around 3:00 p.m. Dean testified he did not
live in the same house as Abshire, but lived with his own family in another home on the same land. 
Nonie testified she would run errands from time to time without Abshire. Thus, Abshire's witnesses
did not testify Abshire was never alone with the complainant. At most, their testimony was that they
never saw him act inappropriately toward the complainant.

 It is also true there was much testimony concerning the consistent visitation of relatives at
the Abshire home and that the family had access to each room in the house. While this testimony
might open the door for some type of rebuttal evidence, it did not open the door for Woods's
testimony because her testimony was not probative of Abshire's opportunity to molest the
complainant.

 Much had changed in the Abshire home in the thirteen years between the times Woods
claimed to have been sexually abused and the times the complainant claimed to have been sexually
abused. Woods testified her father would order David and Dean, whom the evidence showed were
about the same age as Woods, to stay in one room while he sexually abused her in another room, or
he would lock them out of the room while he sexually abused her. However, David and Dean were
adults when the complainant was alleged to have been sexually abused.

 Further, Nonie testified that she worked until around 1995, but that she was not working
when the complainant claimed to have been sexually abused. She also testified the house had been
remodeled from the time Woods lived there. Large windows and a back porch were added,
providing a more open view inside the home. Finally, Woods testified she lived in the Abshire
home, but the evidence showed the complainant lived in a nearby home on the same land.

 It is also true, as the majority observes, that Nonie was far more emphatic that she was with
Abshire consistently in the months leading up to May 10, 1998. Nevertheless, Woods's testimony
would not rebut Nonie's testimony because Woods testified to events that occurred thirteen years
earlier. She testified that she has lived with her husband in Jasper, Texas, since she left home and
did not testify that she even visited the Abshire home in the months or years before the offense in
this case.

 Further, the majority unfairly takes much of Nonie's testimony out of context. The majority
states that Nonie testified she and Abshire had been "together" for thirty-two years and that she
"never saw nothing like that." Her statement that she had been "together" with Abshire for thirty-two
years was not testimony that she never left his side. Rather, she was testifying about the length of
their relationship; i.e., they lived together for eleven years and then were married for twenty-one
years.

 Her comment that she "never saw nothing like that" did not refer to Abshire at all. Rather,
it was elicited by the prosecutor on cross-examination when he asked Nonie why the complainant
might have made these accusations against Abshire. Nonie asserted that another relative, Glynn
Fountain, was trying to "get back at her." The prosecutor asked, "To get you back, [do] you think
he [Fountain] would have sexually abused [the complainant] himself?" Nonie responded, "I don't
know. I can't say that. I've never saw nothing like that."

 The majority also quotes the appellant's brief, which says, "In summary, the testimony of
appellant's family was that they had lived in the same home with appellant for approximately thirty
years and had not witnessed him perform sexual acts on anyone." (Emphasis added.) The statement
is inaccurate. David, Dean, and Nonie never say they had not witnessed Abshire perform sexual acts
on anyone. They never alluded to that. They simply said that they were around Abshire on May 10,
1998, and he was not around the complainant, that they have access to his house and the rooms in
his house, and that they have never seen him act inappropriately toward the complainant.

 The majority's second theory why Woods's testimony was admissible is that it rebutted a
"false impression" of Abshire's own law-abiding behavior. The majority observes that, in his
rebuttal of Woods's testimony, Abshire presented testimony that he had been accused of sexually
abusing Nola James, Christopher James, and Veronica Berza. The majority also observes that
Abshire testified he had been accused of several rapes, but denied committing them, and that he had
never been put on probation "for molesting any child."

 This testimony occurred after the defense had rested and after Woods's testimony had already
been admitted during the State's rebuttal. Therefore, Abshire's rebuttal evidence cannot provide a
justification for admitting Woods's testimony in the first place.

 The majority's third theory is that Woods's testimony was necessary to rebut Abshire's
defensive theory. The majority observes, "Abshire's main defense was that [the complainant] had
been sexually abused numerous times but that the abusers were [the complainant's] father, Robert
James, and two other men, Glynn Fountain and a Mr. Bowman, both relatives of [the complainant]." 

 However, the majority mischaracterizes Abshire's evidence. During Abshire's case-in-chief,
he did not elicit testimony regarding abuse by Robert James. But, as observed previously, the
prosecutor elicited this information in his cross-examination of Nonie.

 Likewise, Abshire never elicited testimony that the complainant had been sexually abused
by Fountain. Rather, as observed previously, it was the prosecutor who elicited this information in
a hypothetical question posed to Nonie on cross-examination. In fact, Fountain testified for the State
during its case-in-chief, and Abshire did not cross-examine him regarding any allegation that he
sexually abused the complainant.

 The majority is correct that on redirect examination of Nonie, Abshire did elicit testimony
that Bowman had been accused of sexual abuse. However, the testimony does not reveal whether
the allegations were that Bowman had sexually abused the complainant or that he had sexually
abused someone else. The actual testimony is as follows:

 Q. Since Nola -- well, since [the complainant] and Nola have gone over
there to live with the Bowmans -- when they went over there in May of 1998, was
Mr. Bowman still alive.

 

 A. Yes, he was.


 Q. It's Margaret - .


 A. And he was sick with cancer, too.


 Q. Is that Margaret Bowman's husband?


 A. Yes, he is.


 Q. Were similar allegations that have been made against Dale been made
against Mr. Bowman?


 A. Yes, it was.


 Q. Okay. If you know, whatever happened with that claim?


 [Prosecutor]: Your Honor.


 A. Nothing.


 [Prosecutor]: Your Honor, again, I'm going to have to object
as to what the basis of her knowledge is. I'd like to go into, you know -- but I'm
going to withdraw it now.


Any other evidence regarding abuse by others against the complainant came out during Abshire's
rebuttal after Woods's testimony had already been admitted. It cannot, therefore, provide a basis for
admitting her testimony.

 The fact is that Abshire's defense was that he did not have an opportunity on May 10, 1998,
to molest the complainant and that the proximity of his relatives' houses to his house and the access
they had to his house reduced the likelihood that he could have repeatedly abused the complainant. 
Woods's testimony was not relevant to rebut that defense because the abuse she alleged occurred
over ten years earlier, when the situation in the Abshire house was different.

 In its brief, the State contends Woods's testimony was admissible to show motive, identity,
and a signature-type crime. Though the majority does not address the State's contentions, a close
examination of the arguments demonstrates that Woods's testimony was not admissible under any
of those theories.

 The State points to Woods's testimony that Abshire told her it was his responsibility as her
father to teach her about sex as demonstrating his motive for molesting the complainant. Motive is
not an essential element of a crime, but evidence of motive is always admissible because it is
relevant as a circumstance tending to prove the commission of an offense. Bush v. State, 628 S.W.2d
441, 444 (Tex. Crim. App. 1982); Rodriguez v. State, 486 S.W.2d 355, 358 (Tex. Crim. App. 1972). 
For evidence to be admissible as proof of motive, it must tend to raise an inference that the accused
had a motive to commit the alleged offense for which he is on trial. Bush, 628 S.W.2d at 444;
Rodriguez, 486 S.W.2d at 358. Other courts have observed that the admissibility of extraneous
offense evidence to prove motive is usually required to relate to other acts by the accused against the
complainant of the crime for which the accused is presently being tried. Zuliani v. State, 903 S.W.2d
812, 827 (Tex. App.Austin 1995, pet. ref'd) (citing Foy v. State, 593 S.W.2d 707, 708-09 (Tex.
Crim. App. [Panel Op.] 1980)); see also Powell v. State, No. 12-98-00049-CR, 2000 WL 760988,
at *3 n.3 (Tex. App.Tyler May 31, 2000, pet. granted); Lazcano v. State, 836 S.W.2d 654, 660
(Tex. App.El Paso 1992, pet. ref'd).

 The State offered Woods's testimony for the purpose of supplying a motive for molesting the
complainant. However, the complainant's testimony did not raise the issue of motive. In addition,
the relevance of this evidence is lessened by the fact that the complainant is Abshire's niece and not
his daughter. Woods testified Abshire told her it was his responsibility as her father to teach her
about sex. Assuming this was his motive for molesting Woods, there is no indication his motive
would apply to members of his extended family.

 The State also contends Woods's testimony is relevant to show Abshire's intent. The State
accused Abshire of intentionally or knowingly causing the complainant's sexual organ to contact his
sexual organ. See Tex. Pen. Code Ann. § 22.021(a)(1)(B)(iii) (Vernon Supp. 2001). However,
Abshire did not specifically contest the intent element; rather, he defended himself on the basis that
he did not commit the crime. Thus, the complainant's testimony supplied the intent element for the
offense, and intent was not a material issue in the case. Even if it were, Woods's testimony would
not show Abshire's intent to molest the complainant apart from the evidence's tendency to show he
acted in conformity with his character.

 Finally, the State contends Woods's testimony was relevant to show a signature-type crime. 
A claim that an extraneous offense is relevant to show a signature-type crime is often a shorthand
way of saying it is relevant to show the identity of the perpetrator of the charged offense, his modus
operandi, or the absence of a mistake or accident. See Taylor v. State, 920 S.W.2d 319, 322 (Tex.
Crim. App. 1996); Owens v. State, 827 S.W.2d 911, 915 (Tex. Crim. App. 1992). When an
extraneous offense is offered as emblematic of a signature-type crime, the common characteristics
or the device used in each offense must be so unusual and distinctive as to be like a "signature." 
Collazo v. State, 623 S.W.2d 647, 648 (Tex. Crim. App. [Panel Op.] 1981). Signature features must
consist of more than mere repeated commissions of the same class of crimes, such as burglaries or
robberies. Owens, 827 S.W.2d at 915.

 There are elements of Woods's testimony that would, under certain conditions, provide a
basis for asserting a signature-type crime. The complainant did not testify about any of these
signature elements that was similar to Woods's testimony. She testified only that Abshire assaulted
her. Woods's testimony is nothing more than a repeated instance of the aggravated sexual assault
of a child crime for which Abshire was on trial.

 Further, as mentioned previously, extraneous offense evidence must be relevant to establish
a fact of consequence in the case, apart from establishing character conformity. Rankin v. State, 974
S.W.2d 707, 709-10 (Tex. Crim. App. 1996). Here Abshire's identity, his modus operandi, and
whether the offense was a mistake or accident were not in issue. The complainant identified Abshire
as the perpetrator, and Abshire defended himself on the basis that he did not commit the offense. 
Woods's testimony was relevant to show nothing more than that Abshire acted in conformity with
his character. Thus, the trial court erred in overruling Abshire's objection to Woods's testimony
under Rule 404(b).

 Abshire was harmed by the error of admitting Woods's testimony. Nonconstitutional error
is harmless when it does not affect the defendant's substantial rights. Tex. R. App. P. 44.2(b). A
substantial right is affected when the error had a substantial and injurious effect or influence on the
jury's verdict. King v. State, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). Reversal is not required
if, after reviewing the record as a whole, the appellate court has a fair assurance that the error did not
influence the jury's verdict or had only a slight effect. Johnson v. State, 967 S.W.2d 410, 417 (Tex.
Crim. App. 1998).

 The State presented medical evidence that the complainant had been repeatedly sexually
abused. However, the evidence also showed that the complainant told both a sexual assault nurse
examiner and Fountain, whom the evidence showed was a convicted felon, that she had been
sexually abused by two men, her father and Dale Abshire. The complainant repeated her earlier
statements in her testimony before the jury. Thus, the State's case relied on the complainant's
credibility, while Abshire's case relied on his assertions that he did not molest the complainant. 


 A jury would unlikely have judged Woods's testimony to discredit Abshire and would have
been influenced to have tried him as a criminal. Generally, this influence on the present case was 
harmful error. I respectfully dissent.



 Ben Z. Grant

 Justice


Date Submitted: January 4, 2001

Date Decided: November 28, 2001


Publish