

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-25-00053-CR

---

KELLEN WARREN TRAMEL, Appellant

V.

THE STATE OF TEXAS, Appellee

---

On Appeal from the 8th District Court
Hopkins County, Texas
Trial Court No. 2430253

---

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice van Cleef

# MEMORANDUM OPINION

A Hopkins County jury found Kellen Warren Tramel guilty of aggravated assault with a deadly weapon and, after finding both punishment enhancement paragraphs true, assessed Tramel's sentence at sixty-seven years' incarceration. *See* TEX. PENAL CODE ANN. § 22.02(a)(2) (Supp.). On appeal, Tramel challenges (1) the sufficiency of the evidence to support (a) the deadly weapon finding and (b) the finding of true as to the enhancement paragraphs (issues one and five), (2) the trial court's denial of his motion to suppress regarding the extent of the search conducted at his shop (issue two), and (3) the trial court's admission of evidence of his prior misconduct and jail time (issues three and four). Because we find that a rational jury could conclude beyond a reasonable doubt that Tramel was in possession of a deadly weapon and that there was no error in the trial court's denial of Tramel's motion to suppress or in the trial court's admission of rebuttal evidence, we affirm the trial court's judgment.

## I. Evidence At Trial

Deputy Bobby Osornio of the Hopkins County Sheriff's Office (HCSO) testified that he was dispatched to a disturbance call involving a firearm on November 13, 2023. When he first arrived at the scene, he encountered Tonya Perez, who stated, "He shot at me. He's got a gun. He's going to kill me." Perez continued past Osornio to the next patrol vehicle, and Osornio drove down toward the residence on the property, which he had been to before. Osornio testified that he and other officers attempted to locate Tramel inside the residence, but he was not there. The officers searched for approximately an hour before using a drone with a thermal camera to successfully locate Tramel hiding on the property.

Osornio also testified that he photographed the scene and the evidence that was located, which included a shotgun found in Tramel's pickup truck and a spent shell casing. On cross-examination, Osornio confirmed that there was no way to determine who placed the shotgun in the truck or whether the spent casing found was from Tramel shooting at Perez.

HCSO Deputy Brennan Murray was also on the scene the night of the incident and testified that Perez was in his patrol vehicle during the search for Tramel. Murray's body-camera footage was admitted into evidence and played for the jury, wherein Perez informed Murray that Tramel had shot at her and threatened to kill her if the police showed up. Perez gave Murray details as to where she had been when Tramel shot at her, and Murray stated that he searched that area for evidence to corroborate what she had told him and located a spent shotgun shell.

HCSO Patrol Sergeant Joshua Davis was the arresting officer on scene who procured Tramel's consent to search "the shop" for a firearm. During the search of the shop, the officers searched Tramel's pickup truck, which was "pulled just into the shop." In the truck, officers found a shotgun and a box of shotgun ammunition that matched the shell casing located outside. After the shotgun was located, Tramel refused to have a gunshot residue test done, but officers subsequently obtained a warrant to do so.

HCSO Chief Investigator Corley Weatherford testified that in addition to being the officer who handled the drone to search for Tramel that evening, he also secured a search warrant to test for gunshot residue on Tramel. Weatherford gathered a sample from Tramel, secured it, and labeled it for analysis. Weatherford, with consent from Tramel, also took

possession of Tramel's cell phone and conducted a search of the cell phone, discovering, among other things, text messages between Tramel and Perez and between Tramel and his mother, Linda Tramel, who was also present at the scene during the investigation. Weatherford stated that there were also recordings that depicted prior arguments between Tramel and Perez, several of which were played for the jury.

Text conversations between Tramel and his mother after the incident, while officers were still searching for Tramel, indicate that Tramel was aware that there was a gun in his truck and that he asked Linda to say, "Julie drives [the] truck." He told Linda that he did not have a weapon on him and that the cartridge the police found was also from "Julie." Tramel wanted his mother to tell the officers that he had been picked up and was staying away from the house for the night. Linda suggested he turn off his location on his cell phone. Tramel was subsequently located using cell phone tracking and the drone.

Weatherford agreed that it was "within the realm of possibility" that gunshot residue could have been transferred from the arresting officers to Tramel but indicated that he was unsure of any "exact probability" of that occurring. Thomas White, a forensic chemist for the Texas Department of Public Safety Crime Laboratory, analyzed the sample taken from Tramel and confirmed the presence of one primer residue particle, which indicates "the individual having recently either fired a weapon, been near a weapon when it was fired or come into contact with some surface that had gunshot primer residue particles on it, such as if he had handled a firearm or handled a spent cartridge case." White further explained that, "with some very rare

4

exceptions, there is almost nothing else that can generate a particle containing the lead, barium and antimony with a molten appearance" that was detected in Tramel's sample.

Perez testified that she and Tramel were involved in a romantic relationship, and at the time of the incident, they lived on Tramel's mother's property. She described her relationship with Tramel as "[c]haos" with "a little bit of happiness." She admitted she had a pill addiction, specifically Xanax, which Tramel often supplied her. Perez stated that they had a tumultuous relationship and that she was also to blame for some of the troubles they faced. She stated that there were times that Tramel got physical with her, pushing or threatening her.

On the night of the incident, Perez stated that she had told Tramel she planned to move back to Florida, and he attacked her without warning. She was able to get outside and call the police. Perez explained that she intended to call back and say it was just an accident but that Tramel then came outside with a gun "yelling and screaming" before "[h]e shot the gun." She called 9-1-1 again after he shot the gun because she believed "he was going to kill [her]." Perez said that Tramel threatened to "blow [her] F-ing brains out" if she called the police. She tried apologizing to calm Tramel down and eventually ran to Linda's house to get help but ended up hiding in the bushes until the police arrived. When the police arrived, she ran to them to seek safety.

After the incident, she and Tramel eventually lived together again while the charges were pending. Perez also attempted to have the State drop the charges against Tramel. Perez explained that she felt guilty for "trigger[ing]" the incident by saying she wanted to return to Florida and wanted to keep Tramel out of jail. Perez visited Tramel in jail and said that he tried

5

to get her to say that she was the one with the gun and that it accidentally discharged when he tried to take it from her.

On cross-examination, Perez could not recall if she had put in her written statement that Tramel shot at her, but she reaffirmed that she told the police that he had. She repeatedly disagreed with the defense's assertion that she was concocting the story to have Tramel arrested.

Linda testified that the relationship between Tramel and Perez was "toxic." She described Perez as erratic, oftentimes related to her pill addiction. Linda stated that on the night of the incident, she was awakened by Perez "beating on [her] door," but when Linda went out, Perez was gone. Linda stated that she did not hear any gunshots that evening. Linda explained that the shotgun that was recovered by police belonged to her late husband and was usually stored at her home but that Perez had borrowed it at some point. Linda stated that other people also had access to the shotgun, including her grandson, who would fire the shotgun on the property at times.

On cross-examination, Linda denied having heard a loud noise on the property the night of the incident. When confronted with her text message exchange with Tramel in which she wrote, "How did the power go out? We heard a noise," Linda maintained she meant when Perez knocked on her door, even though approximately two minutes later she messages her son, "She's banging on [the] front door."

Julie Ward, Tramel's sister, also lived on Linda's property. She explained that her son would recreationally shoot guns on the property at times. On the night of the incident, Ward

6

explained that she was awakened by the sound of arguing from Tramel and Perez, but she did not recall hearing any gunfire.

At the close of the evidence, the jury returned a verdict of guilty of aggravated assault with a deadly weapon. During the punishment phase, Tramel pled not true to the State's allegations of prior convictions. The State then presented Kenny Stillwagoner, a former investigator with the Hopkins County district attorney's (DA) office, who testified that, in 2014, he witnessed a shooting occur that involved a person shooting a firearm out of the window of a black Dodge pickup truck toward a person standing outside of an apartment building. He followed the vehicle and watched as he waited for the police to respond. After law enforcement arrived to back him up, they were able to access the truck, and the driver was Tramel. They found methamphetamine in the truck and located a shotgun and shotgun shell where Stillwagoner saw Tramel "milling around" after the incident before law enforcement arrived. Stillwagoner confirmed that there was also a passenger in Tramel's vehicle but stated that Tramel confessed to the shooting.

The State then introduced two "penitentiary packets" (pen packet) through Robert Stout, an investigator for the DA's office. Stout confirmed that the two packets reflected that Tramel was the offender in each case and that Tramel had two previous convictions with judgments entered against him for which he "went to the penitentiary on two separate occasions."

Linda testified in the punishment phase as well, discussing Tramel's health concerns and medical conditions and, ultimately, indicating that Tramel should be given the opportunity to

rehabilitate himself and do better with his life. She also confirmed that Tramel had been incarcerated twice.

The jury then returned its verdict on punishment and, having found both prior convictions true, assessed Tramel's sentence at sixty-seven years' incarceration.

## II. Sufficiency of the Evidence

In his first and fifth issues, Tramel raises challenges to the sufficiency of the evidence to support (1) the deadly weapon finding and (2) a finding of true as to his prior convictions.

### A. Standard of Review

"The due process guarantee of the Fourteenth Amendment requires that a conviction be supported by legally sufficient evidence." *Braughton v. State*, 569 S.W.3d 592, 607 (Tex. Crim. App. 2018) (citing *Jackson v. Virginia*, 443 U.S. 307, 315–16 (1979)). "In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt." *Williamson v. State*, 589 S.W.3d 292, 297 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010)). "Our rigorous [legal sufficiency] review focuses on the quality of the evidence presented." *Id.* (citing *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring)). "We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury 'to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim.

App. 2007) (citing *Jackson*, 443 U.S. at 318–19; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007))).

"In our review, we consider 'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'" *Id.* (quoting *Hooper*, 214 S.W.3d at 13). "It is not required that each fact 'point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction.'" *Id.* (quoting *Hooper*, 214 S.W.3d at 13). "Circumstantial evidence and direct evidence are equally probative in establishing the guilt of a defendant, and guilt can be established by circumstantial evidence alone." *Id.* (citing *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13). "Further, 'we must consider all of the evidence admitted at trial, even if that evidence was improperly admitted.'" *Id.* at 297–98 (quoting *Fowler v. State*, 517 S.W.3d 167, 176 (Tex. App.—Texarkana 2017), *rev'd in part by* 544 S.W.3d 844 (Tex. Crim. App. 2018)).

### 1. The Evidence Was Legally Sufficient to Prove a Deadly Weapon Finding

As necessary here, to prove aggravated assault with a deadly weapon the State must prove that Tramel "(1) intentionally or knowingly, (2) threatened imminent bodily injury to [Perez], and (3) used or exhibited a deadly weapon, namely a [shotgun]." *Philmon v. State*, 609 S.W.3d 532, 536 (Tex. Crim. App. 2020); *see* TEX. PENAL CODE ANN. § 22.01(a)(2) (Supp.), § 22.02(a)(2). "A firearm is a deadly weapon *per se*." *Ex parte Huskins*, 176 S.W.3d 818, 820 (Tex. Crim. App. 2005) (orig. proceeding) (citing TEX. PENAL CODE ANN. § 1.07(a)(17)(A)).

"'Use' means that 'the deadly weapon was employed or utilized in order to achieve its purpose,' the commission of the assault." *Ramos v. State*, No. 03-24-00350-CR, 2025 WL 2677894, at *4 (Tex. App.—Austin Sept. 19, 2025, no pet.) (mem. op., not designated for publication) (quoting *Patterson v. State*, 769 S.W.2d 938, 941 (Tex. Crim. App. 1989)). "'Exhibit,' on the other hand, 'means that the weapon was consciously shown or displayed during the commission of the offense.'" *Id.* (quoting *Patterson*, 769 S.W.2d at 941).

In his first issue, Tramel argues that the State did not meet its burden of proving that he used or exhibited a deadly weapon. While Tramel attempted to discredit the testimony of Perez regarding what happened, a victim's testimony alone can be sufficient to support a deadly weapon finding. *See Gomez v. State*, 685 S.W.2d 333, 336 (Tex. Crim. App. 1985) ("Testimony regarding the use of a revolver is sufficient to support a finding of use and exhibition of a deadly weapon."); *see also Wright v. State*, 591 S.W.2d 458, 459 (Tex. Crim. App. [Panel Op.] 1979) (concluding that victim's testimony that defendant drew a "'gun,' 'pistol,' or 'revolver'" and demanded money was "sufficient to authorize the jury to find that a deadly weapon was used"); *Riddick v. State*, 624 S.W.2d 709, 711 (Tex. App.—Houston [14th Dist.] 1981, no pet.) (holding that where witness has positively identified weapon as pistol, nothing more is required to support conviction of use of "a deadly weapon, to wit, a firearm"). The jury heard testimony directly from Perez that Tramel exited the shop with a shotgun and fired it in her direction, threatening to "blow [her] F-ing brains out" if she called the police. From that testimony alone, which the jury could find credible, there was sufficient evidence to support the deadly weapon finding.

10

Furthermore, the officers testified that the location of the spent shell casing corroborated Perez's recollection of events and that Tramel tested positive for gunshot residue, which indicated that he had "either fired a weapon, been near a weapon when it was fired or come into contact with some surface that had gunshot primer residue particles on it, such as if he had handled a firearm or handled a spent cartridge case."

Viewing the evidence in a light most favorable to the verdict, we find that a rational jury could have found beyond a reasonable doubt that Tramel used or exhibited a deadly weapon. We overrule Tramel's first issue as it relates to the legal sufficiency of the deadly weapon finding. *See Lay v. State*, 359 S.W.3d 291, 295 (Tex. App.—Texarkana 2012, no pet.).

### 2. The Evidence Was Legally Sufficient to Support the Jury's Finding of True to Both Prior Convictions

In his fifth issue, Tramel argues that the evidence was insufficient to prove his prior convictions for the felony offense of tampering with/fabricating physical evidence with the intent to impair and the felony offense of deadly conduct, discharge of a firearm, beyond a reasonable doubt during the punishment phase. He argues that the State relied solely on the pen packets to support the prior convictions, but he contends that the State failed to meet its burden of proof beyond a reasonable doubt that Tramel was the person convicted in those matters.

"To establish that a defendant has been convicted of a prior offense [for sentence enhancement purposes], the State must prove beyond a reasonable doubt that (1) a prior conviction exists, and (2) the defendant is linked to that conviction." *Flowers v. State*, 220 S.W.3d 919, 921 (Tex. Crim. App. 2007). As our sister court discussed,

11

> Under *Langston* and *Banks,* a pen packet is admissible as evidence of a prior conviction if the pen packet contains either (1) a properly certified judgment and sentence, or (2) the "the functional equivalent of the judgment and sentence required by Texas law." *Langston* [*v. State*, 776 S.W.2d 586, 587–88 (Tex. Crim. App. 1989)]; *Banks* [*v. State*, 158 S.W.3d 649, 652 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd)]. A pen packet may contain the functional equivalent of a judgment and sentence if its enclosed documents are properly authenticated and representative of a final conviction. *See Martin v. State*, 227 S.W.3d 335, 337 (Tex. App.—Houston [1st Dist.] 2007, no pet.); *Banks*, 158 S.W.3d at 652–53.

*Flores v. State*, No. 14-10-00976-CR, 2011 WL 5009483, at *3 (Tex. App.—Houston [14th Dist.] Oct. 20, 2011) (mem. op., not designated for publication), *pet. struck*, 2012 WL 85326 (Tex. Crim. App. Jan. 11, 2012) (per curiam) (not designated for publication).

In this case, the pen packets contained certified judgments of conviction for tampering with evidence with intent to impair and deadly conduct, discharge of a firearm, and numerous other convictions. The pen packets also contained, among other documents, the individual state identification number assigned to Tramel, Tramel's personal information, including his full name and date of birth, as well as photographs of Tramel taken by the Texas Department of Criminal Justice. The State also presented law enforcement officers familiar with Tramel and his criminal record. Furthermore, "[t]he jury could examine the photos and description in the pen packet[s] and compare them to [Tramel]." *Kee v. State*, Nos. 02-24-00312-CR, 02-24-00313-CR and 02-24-00314-CR, 2025 WL 2088329, at *3 (Tex. App.—Fort Worth July 24, 2025, no pet.) (mem. op., not designated for publication) (citing *Yeager v. State*, 737 S.W.2d 948, 951–52 (Tex. App.—Fort Worth 1987, no pet.) (op. on remand); *Billington v. State*, No. 08-12-00144-CR, 2014 WL 669555, at *4 (Tex. App.—El Paso Feb. 19, 2014, no pet.) (not designated for publication); *Meek v. State*, No. 03-05-00269-CR, 2006 WL 2080644, at *3 (Tex. App.—Austin

12

July 28, 2006, no pet.) (mem. op., not designated for publication); *Levario Diaz v. State*, No. 08-02-00389-CR, 2004 WL 2726089, at *2 (Tex. App.—El Paso Nov. 24, 2004, pet. ref'd) (mem. op., not designated for publication); *Lamkin v. State*, No. 02-03-00265-CR, 2004 WL 1909292, at *2 (Tex. App.—Fort Worth Aug. 26, 2004, pet. ref'd) (per curiam) (mem. op., not designated for publication)). We find that sufficient evidence supports the jury's finding of true as to Tramel's prior convictions. We overrule Tramel's fifth issue.

## III. Motion to Suppress

In Tramel's second issue, he challenges the trial court's denial of his motion to suppress the search conducted by the officers that lead to the discovery of the shotgun in his truck. Tramel's issue centers on the scope of his consent, arguing that his consent was limited to "the shop" and that the officers exceeded that consent by searching the interior of his vehicle.

### A. Standard of Review and Applicable Law

"We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard." *Martin v. State*, 620 S.W.3d 749, 759 (Tex. Crim. App. 2021). "We give almost total deference to the trial court's findings of fact and review *de novo* the application of the law to the facts." *Id.* (quoting *State v. Ruiz*, 577 S.W.3d 543, 545 (Tex. Crim. App. 2019)). "When a trial judge makes express findings of fact, an appellate court must examine the record in the light most favorable to the ruling and uphold those fact findings so long as they are supported by the record." *Id.* (quoting *State v. Rodriguez*, 521 S.W.3d 1, 8 (Tex. Crim. App. 2017)). "We will uphold the trial court's ruling if it is correct under any applicable theory of law and the record reasonably supports it." *Id.*

13

"The scope of consent may be limited either 'by its expressed object' or by any limitations the suspect expresses when consenting." *Chung v. State*, 475 S.W.3d 378, 386 (Tex. App.—Waco 2014, pet. ref'd) (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)). "The standard for measuring the scope of consent 'is that of "objective" reasonableness' or what the ordinary reasonable person would have understood under the same circumstances." *Johnson v. State*, 226 S.W.3d 439, 443 (Tex. Crim. App. 2007) (quoting *Jimeno*, 500 U.S. at 251).

### B.      Analysis

After Tramel was located hiding on the property, Davis asked him for consent to search his shop for a firearm. The truck in question was parked just inside the bay door of the shop, and Davis testified that because the truck was parked inside the shop, he searched it looking for the firearm. In his motion to suppress, Tramel argued that the search of his vehicle "violated his rights" because the search "exceeded the scope of his consent to search the shop." His argument asserts that the deputies were "limited" in their search "by explicitly requesting consent from Mr. Tramel to search the shop" and that they exceeded that limited consent when they entered the pickup truck.

In its order denying Tramel's motion to suppress, the trial court stated "that it is objectively reasonable that the scope of the unqualified consent included the vehicle— particularly the cab of the vehicle—parked in the shop to be searched." We agree. "We use an objective standard of what a reasonable person would have understood to be the scope, based on the exchange between the officer and the person allegedly giving consent." *Lopes v. State*, 85

14

S.W.3d 844, 849 (Tex. App.—Waco 2002, no pet.) (citing *Jimeno*, 500 U.S. at 251). "One does not look for an elephant in a matchbox." *Id.*

Tramel consented to the deputies searching for firearms in the shop; the vehicle, as the parties agree, was parked partially in the area to be searched and could reasonably contain a firearm. At no point did Tramel revoke his consent when the deputies were searching, nor did he restrict the search to certain areas within the shop. *See Velez v. State*, 240 S.W.3d 261, 266 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd). Viewing the evidence in a light most favorable to the trial court's ruling, *see Martin*, 620 S.W.3d at 759, we hold that the trial court did not abuse its discretion by denying Tramel's motion to suppress. We overrule Tramel's second point of error.

## IV.     Admission of Evidence

By his third and fourth issues, Tramel challenges the trial court's admission of evidence related to prior misconduct by Tramel as well as allowing testimony and closing argument in the guilt innocence phase of trial that discussed his prior time spent in jail. The State responds that the testimony complained of was admitted as rebuttal character evidence.

### A.     Standard of Review and Applicable Law

"Appellate courts review a trial court's ruling on the admissibility of Rule 404(b) evidence for an abuse of discretion." *Dabney v. State*, 492 S.W.3d 309, 318 (Tex. Crim. App. 2016). "The trial court's ruling on whether extraneous-offense evidence was admissible to rebut a defensive theory should be upheld if it is within the zone of reasonable disagreement." *Id.* "An appellate court will not reverse a trial court's ruling [to admit evidence] unless that ruling

falls outside the zone of reasonable disagreement." *Burden v. State*, 55 S.W.3d 608, 615 (Tex. Crim. App. 2001). The Texas Court of Criminal Appeals has explained,

> A trial court's ruling is generally within th[e] zone if the evidence shows that 1) an extraneous transaction is relevant to a material, non-propensity issue, and 2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury. Furthermore, if the trial court's evidentiary ruling is correct on any theory of law applicable to that ruling, it will not be disturbed even if the trial judge gave the wrong reason for his right ruling.

*De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009) (footnote omitted) (citation omitted). All relevant evidence is admissible unless it is excluded by law. TEX. R. EVID. 402. "Evidence is relevant if . . . it has any tendency to make" the existence of any "fact [that] is of consequence [to the] determin[ation of] the action" "more or less probable than it would be without the evidence." TEX. R. EVID. 401.

Further, "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." TEX. R. EVID. 404(a)(1). However,

> [t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On timely request by a defendant in a criminal case, the prosecutor must provide reasonable notice before trial that the prosecution intends to introduce such evidence—other than that arising in the same transaction—in its case-in-chief.

TEX. R. EVID. 404(b)(2); *see Moses v. State*, 105 S.W.3d 622, 626 (Tex. Crim. App. 2003). "The exceptions listed under Rule 404(b) are neither mutually exclusive nor collectively exhaustive." *De La Paz*, 279 S.W.3d at 343. "Rule 404(b) is a rule of inclusion rather than exclusion." *Id.* (quoting *United States v. Bowie*, 232 F.2d 923, 929 (D.C. Cir. 2000)). "The rule excludes only

16

that evidence that is offered (or will be used) *solely* for the purpose of proving bad character and hence conduct in conformity with that bad character." *Rogers v. State*, No. 06-23-00054-CR, 2023 WL 7554328, at *4 (Tex. App.—Texarkana Nov. 15, 2023, no pet.) (mem. op., not designated for publication) (quoting *De La Paz*, 279 S.W.3d at 343).

But, when a defendant raises a defensive theory, he "opens the door" for the State to offer rebuttal evidence regarding an extraneous offense if the extraneous offense has characteristics common with the offense for which the defendant was on trial. *Dabney*, 492 S.W.3d at 317. Simply stated, "[a]s a general proposition, when a party introduces matters into evidence, he invites the other side to reply to that evidence." *Wheeler v. State*, 67 S.W.3d 879, 885 n.13 (Tex. Crim. App. 2022) (citing *Kincaid v. State*, 534 S.W.2d 340, 342 (Tex. Crim. App. 1976)).

### B.    Analysis

Tramel first argues that the trial court erred in allowing the State to present evidence of a prior disturbance between Tramel and Perez that Osornio responded to in July 2023. Tramel argues that Osornio's testimony related to the July 2023 incident carried "minimal probative value on the central issue" and that it was cumulative of other testimony that had already been heard. His contention is that the evidence "painted [him] as violent, controlling, and vindictive, precisely the type of impermissible character inference that Rule 403 is designed to prevent."

Osornio testified that in July 2023, he responded to a disturbance call at the same location as the November incident. He explained that when he arrived, Perez had left the scene, and he met with her at a local business nearby, where Perez informed him that there was a "disturbance" between her and Tramel, that Tramel would not allow her to leave, and that, during that time,

17

Tramel ran her clothes over with a lawn mower. Tramel had also taken her identification, credit, and debit cards. Osornio then took Perez back to the residence, where she retrieved the items of clothing that had not been destroyed and some of her remaining items in the shop before leaving with a friend. Osornio explained that he remained with her to protect her from further violence if Tramel returned.

The State argues that this evidence was admissible as rebuttal evidence after the defense presented several witnesses who testified that Perez was manipulative and would call the police to make false reports against her boyfriends. Tramel's mother and sister both testified as to their thoughts regarding Perez's personality and demeanor, with Linda stating she believed Perez to be "taking advantage of [her] son." Linda described Perez as "evil" in a text message. The defense also called a former boyfriend of Perez who testified similarly that Perez would threaten to call the police on him, that she was addicted to pills, and that she relied on him to support her addiction. He explained that Perez would lie and say that he assaulted her or tried to kill her.

> When conducting a Rule 403 balancing test, we
>
> must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Price v. State*, 594 S.W.3d 674, 680 (Tex. App.—Texarkana 2019, no pet.) (quoting *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006)). "In any given case,

'these factors may well blend together in practice.'" *Id.* (quoting *Gigliobianco*, 210 S.W.3d at 642).

Here, the jury heard a lot of testimony regarding the contentious nature of the relationship between Tramel and Perez. The defensive theory primarily rested on the contention that Perez was often the aggressor, that her addiction to pills caused her to act out against Tramel, and that she would often fabricate lies to tell law enforcement. The entire theory rested on creating a negative image of the alleged victim in this case and to display her motive for her actions. The State, in order to rebut the evidence, used additional evidence that included prior bad acts of Tramel during the course of his relationship with Perez. Allowing the State to elicit testimony of another time when Perez called the police for a disturbance was highly probative to negate the defensive theory. Furthermore, the defense witnesses repeatedly discussed the chaotic nature of the relationship between Perez and Tramel, discussed other arguments the couple had, and discussed the use of drugs. The rebuttal evidence was not drawn out, the State did not consume "an inordinate amount of time" in presenting it, and we do not see how the evidence would give rise to a decision based on any improper basis. *See Gigliobianco*, 210 S.W.3d at 641–42.

Balancing the probative force of the evidence with the applicable factors, we conclude the trial court could have reasonably determined that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. *See* TEX. R. EVID. 403; *see also Gigliobianco*, 210 S.W.3d at 641–42. We overrule Tramel's third issue.

Tramel next contests the trial court's decision to allow the State to ask Linda about Tramel's prior criminal history and time spent in jail after the State argued that Linda's

19

testimony had "opened the door." During her cross-examination, Linda discussed her beliefs about how Perez was addicted to pills and would cause trouble because of her addiction. When asked by the State about Tramel's own drug use, Linda responded, "Well, yeah, but he wasn't mean." After her response, the State argued that Linda's statement opened the door to Tramel's violent criminal history, of which she had knowledge. Overruling a Rule 403 objection, the trial court allowed the State to delve into a line of questioning regarding Tramel's criminal history. The State then elicited testimony from Linda that she was aware that Tramel had been arrested for and convicted of discharging a firearm in the direction of a person and aggravated assault, for which he went to the penitentiary twice. Even though she was aware of Tramel's violent criminal history, Linda maintained that Tramel "never hurt anybody." Subsequently, in closing arguments, the State reiterated the exchange by saying, "Now you do know that, 'Now, wait a second, Ms. Tramel. He's not mean?' He's been to prison twice for shooting at people, different people, two separate times."

Tramel argues that the elicited testimony from Linda, as well as the State's use of the testimony in its closing, violated Rule 403 and amounted to "highly inflammatory character evidence, which affected [Tramel's] substantial rights." As a general rule, specific acts of misconduct may not be introduced to impeach a party or a witness. *See Prescott v. State*, 744 S.W.2d 128, 130 (Tex. Crim. App. 1988). However, when a party produces evidence tending to "create[] a false impression of [his] law-abiding behavior, he 'opens the door' on his otherwise irrelevant past criminal history, and opposing counsel may" introduce evidence tending to rebut the false impression. *Delk v. State*, 855 S.W.2d 700, 704 (Tex. Crim. App. 1993), *overruled on*

20

*other grounds by Ex parte Moreno*, 245 S.W.3d 419, 425 (Tex. Crim. App. 2008) (quoting *Prescott*, 744 S.W.2d at 132); *see Abshire v. State*, 62 S.W.3d 857, 861 (Tex. App.—Texarkana 2001, pet. ref'd); *Wells v. State*, 880 S.W.2d 185, 188 (Tex. App.—Texarkana 1994, pet. ref'd); *Monkhouse v. State*, 861 S.W.2d 473, 476 (Tex. App.—Texarkana 1993, no pet.). In order for this exception to apply, however, the defense must unambiguously create a false impression of law-abiding behavior, thereby permitting introduction of evidence of past criminal history. *See Delk*, 855 S.W.2d at 704–05.

Tramel argues that the State should not have been allowed to elicit testimony regarding his prior criminal history and that the trial court abused its discretion in admitting and permitting the State to argue that Tramel had previously been to the penitentiary. Here, Linda's testimony that, while her son may have had an issue with drugs, "he wasn't mean," like she indicated Perez had been, was sufficient to allow the State to rebut the "good character" evidence. In a similar case, *Harrison v. State*, the defendant's witness offered testimony that the defendant was a "'good' and 'sweet' boy." *Harrison v. State*, 241 S.W.3d 23, 27 (Tex. Crim. App. 2007). The prosecution was then able to question the witness regarding the defendant's prior assault convictions and citations to rebut the testimony. *Id.* The Texas Court of Criminal Appeals found that the trial court did not err in permitting that line of inquiry because "[u]nder Rules 404 and 405, if the defendant offers evidence of his good character, the prosecution can introduce its own character evidence to rebut the implications of the defendant's character evidence." *Id.*

Linda's testimony was replete with references to Perez's pill addiction, chaotic behavior, manipulation, and general bad character. However, when asked about her own son, she informed

the jury that Tramel was "not perfect" but stated "he wasn't mean," in direct contrast to how she discussed Perez earlier in her testimony. As a result, we find no abuse of discretion in the trial court's admission of the State's rebuttal of the character evidence introduced by Linda with the evidence of Tramel's prior convictions and jail time. *See id.* at 27–28. We overrule Tramel's fourth issue.

## V. Conclusion

We affirm the trial court's judgment.


Charles van Cleef
Justice

Date Submitted:     October 28, 2025
Date Decided:       December 23, 2025

Do Not Publish